**FILED**
CLERK, U.S. DISTRICT COURT

06/14/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   RYAN G. ADAMS (Cal. Bar No. 262227)
4  Special Assistant United States Attorney
   Santa Ana Branch Office
5       Ronald Reagan Federal Bldg. & U.S. Courthouse
        411 West 4th Street, Suite 8000
6       Santa Ana, California 92701
        Telephone: (714) 338-3590
7       Facsimile: (714) 338-3708
        E-mail:    ryan.adams2@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                UNITED STATES DISTRICT COURT

11             FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        No. 8:23-cr-00084-MCS

13              Plaintiff,           PLEA AGREEMENT FOR DEFENDANT
                                     JACQUES POUJADE
14                  v.

15  JACQUES POUJADE,

16              Defendant.

17

18      1.   This constitutes the plea agreement between JACQUES POUJADE

19  ("defendant") and the United States Attorney's Office for the Central

20  District of California (the "USAO") in the investigation of

21  defendant's sale of Tri-Emerald Financial Group, Inc. and LendPlus

22  Holdings, Inc. securities.  This agreement is limited to the USAO and

23  cannot bind any other federal, state, local, or foreign prosecuting,

24  enforcement, administrative, or regulatory authorities.

25                      DEFENDANT'S OBLIGATIONS

26      2.   Defendant agrees to:

27           a.   Give up the right to indictment by a grand jury and,

28  at the earliest opportunity requested by the USAO and provided by the

Court, appear and plead guilty to a single-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

      b.   Not contest facts agreed to in this agreement.

      c.   Abide by all agreements regarding sentencing contained in this agreement.

      d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

      e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

      f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

      g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessment.

      h.   Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

      i.   Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all

2

1   of the documents requested therein, to the USAO by either email at

2   usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

3   Litigation Section at 300 North Los Angeles Street, Suite 7516, Los

4   Angeles, CA 90012.  Defendant agrees that defendant's ability to pay

5   criminal debt shall be assessed based on the completed Financial

6   Disclosure Statement and all required supporting documents, as well

7   as other relevant information relating to ability to pay.

8          j.    Authorize the USAO to obtain a credit report upon

9   returning a signed copy of this plea agreement.

10         k.    Consent to the USAO inspecting and copying all of

11  defendant's financial documents and financial information held by the

12  United States Probation and Pretrial Services Office.

THE USAO'S OBLIGATIONS

14  3.    The USAO agrees to:

15         a.    Not contest facts agreed to in this agreement.

16         b.    Abide by all agreements regarding sentencing contained

17  in this agreement.

18         c.    At the time of sentencing, provided that defendant

19  demonstrates an acceptance of responsibility for the offense up to

20  and including the time of sentencing, recommend a two-level reduction

21  in the applicable Sentencing Guidelines offense level, pursuant to

22  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

23  additional one-level reduction if available under that section.

24         d.    Except for criminal tax violations (including

25  conspiracy to commit such violations chargeable under 18 U.S.C.

26  § 371), not further criminally prosecute defendant for violations of

27  18 U.S.C. §§ 1010 (False Statements to HUD), 1028A (Aggravated

28  Identity Theft), 1343 (Wire Fraud), 1344 (Bank Fraud), and 1957

3

1    (Money Laundering) arising out of defendant's conduct described in

2    the agreed-to factual basis set forth in paragraph 10 below.

3    Defendant understands that the USAO is free to criminally prosecute

4    defendant for any other unlawful past conduct or any unlawful conduct

5    that occurs after the date of this agreement.  Defendant agrees that

6    at the time of sentencing the Court may consider the uncharged

7    conduct in determining the applicable Sentencing Guidelines range,

8    the propriety and extent of any departure from that range, and the

9    sentence to be imposed after consideration of the Sentencing

10   Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

11                          NATURE OF THE OFFENSE

12         4.    Defendant understands that for defendant to be guilty of

13   the crime charged in the single-count information, that is,

14   Securities Fraud, in violation of Title 15, United States Code,

15   Sections 78j(b), 78ff and Title 17 Code of Federal Regulations,

16   Section 240.10b-5, the following must be true: (1) defendant

17   willfully used a devise or scheme to defraud someone, made an untrue

18   statement of a material fact, failed to disclose a material fact that

19   resulted in making the defendant's statements misleading, or engaged

20   in any act, practice, or course of business that operates or would

21   operate as a fraud or deceit upon any person; (2) defendant's acts

22   were undertaken, statement was made, or failure to disclose was done

23   in connection with the sale of stocks and promissory notes, which

24   were securities within the meaning of 15 U.S.C. § 78c(a)(10);

25   (3) defendant directly or indirectly used wire communications in

26   connection with these acts, making this statement, or this failure to

27   disclose; and (4) defendant acted knowingly.

28

1   "Willfully" means intentionally undertaking an act, making an

2   untrue statement, or failing to disclose for the wrongful purpose of

3   defrauding or deceiving someone.  Acting willfully does not require

4   that the defendant know that the conduct was unlawful.

5   A fact is material if there is a substantial likelihood that a

6   reasonable investor would consider it important in making the

7   decision to purchase securities.

8   It is not necessary that an untrue statement passed through or

9   over the wire communications so long as the wire communications were

10  used as part of the sale transaction.

11  It is not necessary that the defendant made a profit or that

12  anyone actually suffered a loss.

<u>PENALTIES AND RESTITUTION</u>

14  5.   Defendant understands that the statutory maximum sentence

15  that the Court can impose for a violation of 15 U.S.C. §§ 78j(b),

16  78ff and 17 C.F.R. § 240.10b-5, is: twenty years of imprisonment; a

17  three-year period of supervised release; a fine of $5 million or

18  twice the gross gain or gross loss resulting from the offense,

19  whichever is greatest; and a mandatory special assessment of $100.

20  6.   Defendant agrees to make full restitution to the victim(s)

21  of the offense to which defendant is pleading guilty.  Defendant

22  agrees that, in return for the USAO's compliance with its obligations

23  under this agreement, the Court may order restitution to persons

24  other than the victim(s) of the offense to which defendant is

25  pleading guilty and in amounts greater than those alleged in the

26  count to which defendant is pleading guilty.  In particular,

27  defendant agrees that the Court may order restitution to any victim

28  of any of the following for any losses suffered by that victim as a

5

result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those charges.  The parties currently believe that the applicable amount of restitution is approximately $6,170,600, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

7.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated

collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9.    Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his conviction on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

<u>FACTUAL BASIS</u>

10.    Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

1    BACKGROUND

2        Tri-Emerald Financial Group, Inc. doing business as ("DBA") Lend

3    Plus ("Tri-Emerald") was a Delaware corporation that maintained its

4    principal place of business in Lake Forest, California, within the

5    Central District of California.  Tri-Emerald operated several

6    subsidiary and affiliated companies and was a fully integrated realty

7    services company that included a non-bank mortgage origination

8    company, a realty brokerage firm, and an online listing aggregator

9    called ThisRoof.com.  Tri-Emerald operated as a residential mortgage

10   lender, licensed under the California Department of Financial

11   Protection and Innovation, and governed under the National Mortgage

12   Licensing System ("NMLS"), and the United States Department of

13   Housing and Urban Development ("HUD").  Tri-Emerald funded loans as a

14   mortgage banker, with the intent to hold the funded loans for

15   immediate resale to financial institutions that purchased the loans

16   for investments.  Neither Tri-Emerald nor its securities were ever

17   registered with the United States Securities and Exchange Commission

18   ("SEC").  Unregistered Tri-Emerald securities were sold to the Victim

19   Investor A.D.

20       LendPlus Holdings, Inc. ("LendPlus") was a Nevada corporation

21   that maintained its principal place of business in Lake Forest,

22   California.  LendPlus was an affiliated company of Tri-Emerald.

23   Neither LendPlus nor its securities were ever registered with the

24   SEC.  Unregistered LendPlus securities were sold to Victim Investor

25   B.H. and his investment group.

26       Defendant, a resident of Irvine, California, established Tri-

27   Emerald and was the Chief Financial Officer, owner, and principal of

28   Tri-Emerald.  Defendant controlled and directed Tri-Emerald's

1  business operations, including the offering and sale of Tri-Emerald

2  securities, use of funds raised from the sale of Tri-Emerald

3  securities, and communication with purchasers of Tri-Emerald

4  securities.  Defendant also controlled Tri-Emerald's Citizens

5  Business Bank account and other bank accounts.

6      Defendant established LendPlus and was the Managing Partner and

7  owner of LendPlus.  Defendant controlled and directed LendPlus'

8  business operations, including the offering and sale of LendPlus

9  securities, use of funds raised from the sale of LendPlus securities,

10  and communication with purchasers of LendPlus securities.  Defendant

11  also controlled LendPlus' Comerica Bank account.

12      Defendant raised money for Tri-Emerald from Victim Investor A.D.

13  by selling securities, namely common stock issued by Tri-Emerald.

14  The common stock issued by defendant in Tri-Emerald constituted

15  "securities" within the meaning of the Securities and Exchange Act of

16  1934.

17      Defendant raised money for LendPlus from Victim Investor B.H.

18  and his investment group by selling securities, namely short-term

19  promissory notes issued by LendPlus.  Each promissory note accrued

20  interest at a specific rate of return.  The promissory notes issued

21  by defendant in LendPlus constituted "securities" within the meaning

22  of the Securities and Exchange Act of 1934.

23  THE SCHEME TO DEFRAUD TRI-EMERALD VICTIM INVESTOR A.D.

24      Beginning in or around February 2015 and continuing through at

25  least in or around May 2020, in Orange County, within the Central

26  District of California, and elsewhere, defendant, together with

27  others, knowingly and willfully, directly and indirectly, by the use

28  of the means and instrumentalities of interstate commerce and the

mails, in connection with the purchase and sale of Tri-Emerald
securities, used and employed manipulative devices and contrivances
by: (1) employing a scheme to defraud; (2) making untrue statements
of material facts and omitting to state material facts necessary in
order to make the statements made, in light of the circumstances
under which they were made, not misleading; and (3) engaging in acts,
practices, and courses of business which operated and would operate
as a fraud and deceit upon Victim Investor A.D., a purchaser of Tri-
Emerald securities, by causing materially false and fraudulent
statements and material omissions to be made to Victim Investor A.D.
about the immediacy and probability of Tri-Emerald's initial public
offering ("IPO") occurring and the resulting share price, the alleged
involvement and representations made by Investment Bank 1 as the
underwriter of Tri-Emerald's IPO, and the use of the funds raised
from the from the sale of Tri-Emerald securities to Victim Investor
A.D.  During the same time period, defendant, knowingly and with the
intent to defraud, also knowingly devised, participated in, and
executed a scheme to defraud Victim Investor B.H. and his investment
group as to material matters, and to obtain money and property by
means of material false and fraudulent pretenses, representations,
promises, and concealment of material facts.

The schemes operated in the following manner:

Defendant offered Victim Investor A.D. investment contracts to
purchase common stock in Tri-Emerald at $10 per share that
constituted "securities" under the Securities and Exchange Act of
1934.

To persuade Victim Investor A.D. to purchase Tri-Emerald common
shares, defendant made, and caused others to make, numerous false and

misleading statements about Tri-Emerald to Victim Investor A.D., both during direct exchanges with Victim Investor A.D. in-person or over the telephone, and through electronic messages transmitted to Victim A.D. via WhatsApp or email.

Defendant instructed Victim Investor A.D. to either write checks or wire payments for Tri-Emerald securities that were deposited into Tri-Emerald's bank accounts, which defendant controlled.

To convince Victim Investor A.D. to purchase Tri-Emerald common shares, defendant falsely represented that Tri-Emerald was a pre-IPO investment opportunity that would provide high returns when Tri-Emerald went public in the very near future.  On numerous occasions defendant lulled, and caused others to lull, Victim Investor A.D. into maintaining and increasing Victim Investor A.D.'s investments in Tri-Emerald by falsely representing to Victim Investor A.D. that Tri-Emerald was mere weeks or months away from completing its IPO and becoming publicly listed on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ").  In truth, as defendant knew, Tri-Emerald was not weeks or months away from completing its IPO because Tri-Emerald had not completed the steps necessary to undertake an IPO, including filing a Form S-1 with the SEC or formally engaging the investment banks defendant claimed to have formally engaged to Victim Investor A.D. to serve as the underwriters.  Because Tri-Emerald had not filed a Form S-1 with the SEC nor formally engaged the investment banks defendant claimed to have formally engaged to Victim Investor A.D. to serve as the underwriters, it could not have completed the IPO process.  For example, defendant made the following false representations to Victim Investor A.D.:

1          i.    On or around August 5, 2015, defendant sent a
2   WhatsApp message to Victim Investor A.D. falsely claiming Tri-Emerald
3   was pursuing "S1 registration in September."

4          ii.   On or around August 8, 2015, defendant sent a
5   WhatsApp message to Victim Investor A.D. falsely claiming that Tri-
6   Emerald would undertake its IPO by the end of September 2015 and
7   stated, "our bankers are saying $2billion [sic] market cap within 2
8   years."

9          iii.  On or around February 20, 2017, defendant sent a
10  WhatsApp message to Victim Investor A.D. that stated, "We are
11  finishing the S1 and the audit."

12         iv.   On or around November 8, 2019, defendant sent an
13  email to Victim Investor A.D. claiming that Tri-Emerald was receiving
14  a round of financing in January 2020 after which Tri-Emerald would
15  pursue its IPO.

16      To further induce Victim Investor A.D. to invest in Tri-Emerald,
17  defendant repeatedly made materially false and misleading statements
18  about Investment Bank 1 and other investment banks serving as the
19  underwriter of Tri-Emerald's alleged IPO.  Defendant misrepresented
20  to Victim Investor A.D. the nature of Tri-Emerald's relationship with
21  Investment Bank 1 and other investment banks, telling Victim Investor
22  A.D. that Investment Bank 1 and other investment banks would serve as
23  the underwriters of Tri-Emerald's alleged IPO.  Defendant also
24  misrepresented to Victim Investor A.D. that Investment Bank 1 stated
25  that it valued Tri-Emerald as a multi-billion-dollar company.  In
26  fact, defendant never formally engaged Investment Bank 1 nor the
27  other investment banks defendant claimed to have formally engaged to
28  Victim Investor A.D.; Investment Bank 1 nor any of the other

investment banks defendant claimed to have formally engaged to Victim Investor A.D. ever conducted due diligence on Tri-Emerald in preparation for an IPO; and Investment Bank 1 nor any of the other investment banks defendant claimed to have formally engaged to Victim Investor A.D. ever performed a valuation of Tri-Emerald or made statements regarding the value of Tri-Emerald.  For example, defendant made the following false representations to Victim Investor A.D.:

i.   On or around November 12, 2015, defendant sent a WhatsApp message to Victim Investor A.D. falsely representing that Investment Bank 1 was "super excited about moving forward" and contending Tri-Emerald would "be a billion dollar company in under 16 months."

ii.   On or around November 12, 2015, defendant sent a WhatsApp message to Victim Investor A.D. falsely representing that Investment Bank 1 stated, "If Zillow can be valued at $6 billion, your company will be worth north of that."

Defendant also falsely represented to Victim Investor A.D. that the price of Tri-Emerald common shares would be over $100 per share once Tri-Emerald completed the IPO process and became publicly traded.  In fact, Tri-Emerald had not taken the steps necessary to go public and an investment bank had never performed a pre-IPO valuation of Tri-Emerald shares.  For example, defendant made the following false representations to Victim Investor A.D.:

i.   On or around June 30, 2015, defendant sent a WhatsApp message to Victim Investor A.D. stating, "At $100 per share that's a big number, at $200 per share its [sic] a nice home run."

Defendant also falsely represented to Victim Investor A.D. that Tri-Emerald would use, and had used, the funds it raised by selling Tri-Emerald common shares to Victim Investor A.D. to complete the IPO.  In doing so, defendant concealed from Victim Investor A.D. material information about the anticipated and actual use of the proceeds from the sale of Tri-Emerald common shares.  In truth, Tri-Emerald did not use the proceeds of the securities it sold to complete the IPO.  Instead, defendant used a substantial portion of the funds for general Tri-Emerald operating expenses and to make lulling payments and litigation settlement payments to previous Tri-Emerald investors.  Additionally, defendant used a portion of the funds for personal expenditures in lieu of taking a salary.

As a result of the scheme to defraud described above, defendant POUJADE, operating through Tri-Emerald, fraudulently obtained approximately $5,255,600 from Victim Investor A.D.

EXECUTION OF THE FRAUDULENT SCHEME

On or about March 18, 2016, within the Central District of California, and elsewhere, for the purposes of executing the above-described scheme to defraud, and in furtherance of the manipulative and deceptive devices described above, defendant directly, indirectly, and willfully caused the use of a means and instrumentality of interstate commerce in connection with the purchase and sale of securities, namely, the transfer of approximately $160,000 from a bank account controlled by Victim Investor A.D., processed through the servers of the Federal Reserve Bank of New York in the States of New Jersey and Texas, by means of interstate wires, to a Citizens Business Bank account in Torrance,

14

1   California controlled by Tri-Emerald for the purchase of 16,000

2   shares of Tri-Emerald Class A Common Shares.

3   THE SCHEME TO DEFRAUD VICTIM INVESTOR B.H. AND HIS INVESTMENT GROUP

4          Defendant offered Victim Investor B.H. and his investment group

5   short-term promissory notes issued by LendPlus.  Each promissory note

6   accrued interest at an annual interest rate of between 5% and 10%,

7   and bonus interest ranging from $1,250 to $2,500 every 30 days, with

8   a default annual interest rate of 16%.  The promissory notes issued

9   by defendant in LendPlus constituted "securities" within the meaning

10  of the Securities and Exchange Act of 1934.

11         To induce Victim Investor B.H. and his investment group to

12  purchase LendPlus securities, defendant falsely represented to Victim

13  Investor B.H. and his investment group that they were investing in

14  Tri-Emerald and not LendPlus.  Defendant falsely told Victim Investor

15  B.H. and his investment group that Tri-Emerald and LendPlus were

16  merging.

17         Defendant falsely represented to Victim Investor B.H. and his

18  investment group that LendPlus would use their funds to hold in a

19  reserve account for the purpose of showing the funds necessary to

20  increase Tri-Emerald's warehouse line of credit which would in turn

21  allow Tri-Emerald to fund a larger volume of mortgages.  Defendant

22  claimed Tri-Emerald needed to maintain a minimum balance in its

23  reserve account pursuant to the credit lender's requirements in order

24  to fund mortgages.  Defendant claimed the victim investors' funds

25  were safe and would remain in the reserve account for the 30-day term

26  of the promissory notes.

27         On or around July 13, 2016, to convince Victim Investor B.H. and

28  his investment group to invest in LendPlus promissory notes,

defendant sent an email to Victim Investor B.H. that described Tri-Emerald's business model and attached a list of mortgages that would be funded as a result of the victim investors' funds being held in the reserve account.  The email was sent from defendant's Tri-Emerald email account which included a signature block listing defendant as the "Managing Partner" of Tri-Emerald and included Tri-Emerald's California Department of Business Oversight and NMLS registration numbers.  Attached to the email was a LendPlus promissory note.

At the end of the term of the 30-day promissory notes, instead of repaying victim investors, defendant continuously rolled victim investors' funds over into the next month.  On numerous occasions defendant lulled, and caused others to lull, Victim Investor B.H. and his investment group into maintaining and increasing their investments in LendPlus by falsely representing to Victim Investor B.H. and his investment group that their funds were safe in a reserve account and that LendPlus was using their funds as a means to increase the warehouse line of credit and in turn increase loan production.

In truth, defendant knew the proceeds raised from the sale of the promissory notes had not been used, and would not be used, as described by defendant to Victim Investor B.H. and his investment group.  Defendant concealed from Victim Investor B.H. and his investment group material information about the anticipated and actual use of the proceeds from the sale of the promissory notes.  In truth, defendant did not use the proceeds of the promissory notes to hold in a reserve account.  Instead, defendant used a substantial portion of the funds for general Tri-Emerald operating expenses and to make lulling payments to previous Tri-Emerald investors.

Additionally, defendant used a portion of the funds for personal expenditures, including paying rent on his personal residence, in lieu of taking a salary.

As a result of the scheme to defraud described above, defendant fraudulently obtained approximately $915,000 from Victim Investor B.H. and approximately eight other victim investors.

SENTENCING FACTORS

11.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

12.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
| Loss Amount b/w $3.5M and $9.5M | +18 | U.S.S.G. §2B1.1(b)(1)(J) |
| 10 or more victims/substantial financial hardship one or more victims | +2 | U.S.S.G. §2B1.1(b)(2)(A) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

13. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

14. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

15. Defendant understands that by pleading guilty, defendant gives up the following rights:

       a.   The right to persist in a plea of not guilty.

       b.   The right to a speedy and public trial by jury.

       c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

       d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

       e.   The right to confront and cross-examine witnesses against defendant.

       f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

1          g.    The right not to be compelled to testify, and, if

2    defendant chose not to testify or present evidence, to have that

3    choice not be used against defendant.

4          h.    Any and all rights to pursue any affirmative defenses,

5    Fourth Amendment or Fifth Amendment claims, and other pretrial

6    motions that have been filed or could be filed.

7                  WAIVER OF STATUTE OF LIMITATIONS

8          16.   Having been fully advised by defendant's attorney regarding

9    application of the statute of limitations to the offense to which

10   defendant is pleading guilty, defendant hereby knowingly,

11   voluntarily, and intelligently waives, relinquishes, and gives up:

12   (a) any right that defendant might have not to be prosecuted for the

13   offense to which defendant is pleading guilty  because of the

14   expiration of the statute of limitations for that offense prior to

15   the filing of the information alleging that offense; and (b) any

16   defense, claim, or argument defendant could raise or assert that

17   prosecution of the offense to which defendant is pleading guilty is

18   barred by the expiration of the applicable statute of limitations,

19   pre-indictment delay, or any speedy trial violation.

20                  WAIVER OF APPEAL OF CONVICTION

21         17.   Defendant understands that, with the exception of an appeal

22   based on a claim that defendant's guilty plea was involuntary, by

23   pleading guilty defendant is waiving and giving up any right to

24   appeal defendant's conviction on the offense to which defendant is

25   pleading guilty.  Defendant understands that this waiver includes,

26   but is not limited to, arguments that the statute to which defendant

27   is pleading guilty is unconstitutional, and any and all claims that

28

1  the statement of facts provided herein is insufficient to support

2  defendant's plea of guilty.

3  <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

4      18.  Defendant agrees that, provided the Court imposes a total

5  term of imprisonment on all counts of conviction of no more than 63

6  months, defendant gives up the right to appeal all of the following:

7  (a) the procedures and calculations used to determine and impose any

8  portion of the sentence; (b) the term of imprisonment imposed by the

9  Court; (c) the fine imposed by the Court, provided it is within the

10  statutory maximum; (d) to the extent permitted by law, the

11  constitutionality or legality of defendant's sentence, provided it is

12  within the statutory maximum; (e) the amount and terms of any

13  restitution order, provided it requires payment of no more than

14  $6,170,600; (f) the term of probation or supervised release imposed

15  by the Court, provided it is within the statutory maximum; and

16  (g) any of the following conditions of probation or supervised

17  release imposed by the Court: the conditions set forth in Second

18  Amended General Order 20-04 of this Court; the drug testing

19  conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the

20  alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

21      19.  Defendant also gives up any right to bring a post-

22  conviction collateral attack on the conviction or sentence, including

23  any order of restitution, except a post-conviction collateral attack

24  based on a claim of ineffective assistance of counsel, a claim of

25  newly discovered evidence, or an explicitly retroactive change in the

26  applicable Sentencing Guidelines, sentencing statutes, or statutes of

27  conviction.  Defendant understands that this waiver includes, but is

28  not limited to, arguments that the statute to which defendant is

pleading guilty is unconstitutional, and any and all claims that the
statement of facts provided herein is insufficient to support
defendant's plea of guilty.

20.  The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment of no less than 51
months' imprisonment, the USAO gives up its right to appeal any
portion of the sentence, with the exception that the USAO reserves
the right to appeal the amount of restitution ordered if that amount
is less than $6,170,600.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

21.  Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge or any civil, administrative, or regulatory action
that was either dismissed or not filed as a result of this agreement,
then (i) any applicable statute of limitations will be tolled between
the date of defendant's signing of this agreement and the filing
commencing any such action; and (ii) defendant waives and gives up
all defenses based on the statute of limitations, any claim of pre-
indictment delay, or any speedy trial claim with respect to any such
action, except to the extent that such defenses existed as of the
date of defendant's signing this agreement.

1              RESULT OF VACATUR, REVERSAL OR SET-ASIDE

2      22.  Defendant agrees that if the count of conviction is

3 vacated, reversed, or set aside, both the USAO and defendant will be

4 released from all their obligations under this agreement.

5                  EFFECTIVE DATE OF AGREEMENT

6      23.  This agreement is effective upon signature and execution of

7 all required certifications by defendant, defendant's counsel, and an

8 Assistant United States Attorney.

9                    BREACH OF AGREEMENT

10     24.  Defendant agrees that if defendant, at any time after the

11 signature of this agreement and execution of all required

12 certifications by defendant, defendant's counsel, and an Assistant

13 United States Attorney, knowingly violates or fails to perform any of

14 defendant's obligations under this agreement ("a breach"), the USAO

15 may declare this agreement breached.  All of defendant's obligations

16 are material, a single breach of this agreement is sufficient for the

17 USAO to declare a breach, and defendant shall not be deemed to have

18 cured a breach without the express agreement of the USAO in writing.

19 If the USAO declares this agreement breached, and the Court finds

20 such a breach to have occurred, then: (a) if defendant has previously

21 entered a guilty plea pursuant to this agreement, defendant will not

22 be able to withdraw the guilty plea, and (b) the USAO will be

23 relieved of all its obligations under this agreement.

24     25.  Following the Court's finding of a knowing breach of this

25 agreement by defendant, should the USAO choose to pursue any charge

26 or any civil, administrative, or regulatory action that was either

27 dismissed or not filed as a result of this agreement, then:

28

1          a.    Defendant agrees that any applicable statute of

2    limitations is tolled between the date of defendant's signing of this

3    agreement and the filing commencing any such action.

4          b.    Defendant waives and gives up all defenses based on

5    the statute of limitations, any claim of pre-indictment delay, or any

6    speedy trial claim with respect to any such action, except to the

7    extent that such defenses existed as of the date of defendant's

8    signing this agreement.

9          c.    Defendant agrees that: (i) any statements made by

10   defendant, under oath, at the guilty plea hearing (if such a hearing

11   occurred prior to the breach); (ii) the agreed to factual basis

12   statement in this agreement; and (iii) any evidence derived from such

13   statements, shall be admissible against defendant in any such action

14   against defendant, and defendant waives and gives up any claim under

15   the United States Constitution, any statute, Rule 410 of the Federal

16   Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

17   Procedure, or any other federal rule, that the statements or any

18   evidence derived from the statements should be suppressed or are

19   inadmissible.

20        COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

21                       OFFICE NOT PARTIES

22   26.  Defendant understands that the Court and the United States

23   Probation and Pretrial Services Office are not parties to this

24   agreement and need not accept any of the USAO's sentencing

25   recommendations or the parties' agreements to facts or sentencing

26   factors.

27   27.  Defendant understands that both defendant and the USAO are

28   free to: (a) supplement the facts by supplying relevant information

1   to the United States Probation and Pretrial Services Office and the

2   Court, (b) correct any and all factual misstatements relating to the

3   Court's Sentencing Guidelines calculations and determination of

4   sentence, and (c) argue on appeal and collateral review that the

5   Court's Sentencing Guidelines calculations and the sentence it

6   chooses to impose are not error, although each party agrees to

7   maintain its view that the calculations in paragraph 12 are

8   consistent with the facts of this case.  While this paragraph permits

9   both the USAO and defendant to submit full and complete factual

10  information to the United States Probation and Pretrial Services

11  Office and the Court, even if that factual information may be viewed

12  as inconsistent with the facts agreed to in this agreement, this

13  paragraph does not affect defendant's and the USAO's obligations not

14  to contest the facts agreed to in this agreement.

15       28.  Defendant understands that even if the Court ignores any

16  sentencing recommendation, finds facts or reaches conclusions

17  different from those agreed to, and/or imposes any sentence up to the

18  maximum established by statute, defendant cannot, for that reason,

19  withdraw defendant's guilty plea, and defendant will remain bound to

20  fulfill all defendant's obligations under this agreement.  Defendant

21  understands that no one -- not the prosecutor, defendant's attorney,

22  or the Court -- can make a binding prediction or promise regarding

23  the sentence defendant will receive, except that it will be within

24  the statutory maximum.

25                       <u>NO ADDITIONAL AGREEMENTS</u>

26       29.  Defendant understands that, except as set forth herein,

27  there are no promises, understandings, or agreements between the USAO

28  and defendant or defendant's attorney, and that no additional

promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

30.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney

_____          06/04/2023
RYAN G. ADAMS                            Date
Special Assistant United States
Attorney

_____          _____
JACQUES POUJADE                          Date
Defendant

_____          5/18/2023
SAMUEL A. JOSEPHS                        Date
Attorney for Defendant JACQUES
POUJADE

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or

25

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4      30.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10  E. MARTIN ESTRADA
    United States Attorney

12  _____          _____
13  RYAN G. ADAMS                        Date
    Special Assistant United States
    Attorney

    *Jacques Poujade*                     5/18/2023
15  J_____            _____
    Defendant                            Date

17  _____          _____
    SAMUEL A. JOSEPHS                    Date
18  Attorney for Defendant JACQUES
    POUJADE

CERTIFICATION OF DEFENDANT

22      I have read this agreement in its entirety.  I have had enough

23  time to review and consider this agreement, and I have carefully and

24  thoroughly discussed every part of it with my attorney.  I understand

25  the terms of this agreement, and I voluntarily agree to those terms.

26  I have discussed the evidence with my attorney, and my attorney has

27  advised me of my rights, of possible pretrial motions that might be

28  filed, of possible defenses that might be asserted either prior to or

25

1  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

2  of relevant Sentencing Guidelines provisions, and of the consequences

3  of entering into this agreement.  No promises, inducements, or

4  representations of any kind have been made to me other than those

5  contained in this agreement.  No one has threatened or forced me in

6  any way to enter into this agreement.  I am satisfied with the

7  representation of my attorney in this matter, and I am pleading

8  guilty because I am guilty of the charge and wish to take advantage

9  of the promises set forth in this agreement, and not for any other

10 reason.

11 *Jacques Poujade*                              5/18/2023

12 JACQUES POUJADE                                Date
   Defendant

13

14

15                 CERTIFICATION OF DEFENDANT'S ATTORNEY

16     I am JACQUES POUJADE's attorney.  I have carefully and

17 thoroughly discussed every part of this agreement with my client.

18 Further, I have fully advised my client of his rights, of possible

19 pretrial motions that might be filed, of possible defenses that might

20 be asserted either prior to or at trial, of the sentencing factors

21 set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

22 provisions, and of the consequences of entering into this agreement.

23 To my knowledge: no promises, inducements, or representations of any

24 kind have been made to my client other than those contained in this

25 agreement; no one has threatened or forced my client in any way to

26 enter into this agreement; my client's decision to enter into this

27 agreement is an informed and voluntary one; and the factual basis set

28

forth in this agreement is sufficient to support my client's entry of
a guilty plea pursuant to this agreement.

_____        5/18/2023
SAMUEL A. JOSEPHS                        Date
Attorney for Defendant JACQUES
POUJADE

# EXHIBIT A

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                         SOUTHERN DIVISION

11   UNITED STATES OF AMERICA,         No.

12             Plaintiff,              I N F O R M A T I O N

13                  v.                 [15 U.S.C. §§ 78j(b), 78ff and
                                       17 C.F.R. § 240.10b-5:
14   JACQUES POUJADE,                  Securities Fraud]

15             Defendant.

16

17        The United States Attorney charges:

18         [15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5]

19   A.   INTRODUCTORY ALLEGATIONS

20        At times relevant to this Information:

21        1.   Tri-Emerald Financial Group, Inc. doing business as

22   ("DBA") Lend Plus ("Tri-Emerald") was a Delaware corporation

23   that maintained its principal place of business in Lake Forest,

24   California, within the Central District of California.  Tri-

25   Emerald operated several subsidiary and affiliated companies and

26   was a fully integrated realty services company that included a

27   non-bank mortgage origination company, a realty brokerage firm,

28   and an online listing aggregator called ThisRoof.com.  Tri-

1    Emerald operated as a residential mortgage lender, licensed by

2    the California Department of Financial Protection and Innovation

3    and six other states, and governed under the National Mortgage

4    Licensing System ("NMLS"), and the United States Department of

5    Housing and Urban Development ("HUD").  Tri-Emerald funded loans

6    as a mortgage banker, with the intent to hold the funded loans

7    for immediate resale to financial institutions that purchased

8    the loans for investments.  Neither Tri-Emerald nor its

9    securities were ever registered with the United States

10   Securities and Exchange Commission ("SEC").  Unregistered Tri-

11   Emerald securities were sold to Victim Investor A.D.

12        2.   Defendant JACQUES POUJADE, a resident of Irvine,

13   California, established Tri-Emerald and was the Chief Financial

14   Officer, owner, and principal of Tri-Emerald.  Defendant POUJADE

15   controlled and directed Tri-Emerald's business operations,

16   including the offering and sale of Tri-Emerald securities, use

17   of funds raised from the sale of Tri-Emerald securities, and

18   communication with purchasers of Tri-Emerald securities.

19   Defendant POUJADE also controlled Tri-Emerald's Citizens

20   Business Bank account and other bank accounts.

21        3.   Defendant POUJADE raised money from Victim Investor

22   A.D. by selling securities, namely common shares issued by Tri-

23   Emerald.  The common shares issued by defendant POUJADE in Tri-

24   Emerald constituted "securities" within the meaning of the

25   Securities and Exchange Act of 1934.

26        4.   Victim Investor A.D. was a resident of Mission Viejo,

27   California.

28   B.   THE SCHEME TO DEFRAUD TRI-EMERALD VICTIM INVESTOR A.D.

2

5.    Beginning in or around February 2015 and continuing through at least in or around May 2020, in Orange County, within the Central District of California, and elsewhere, defendant POUJADE, together with others, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of Tri-Emerald securities, used and employed manipulative devices and contrivances by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon Victim Investor A.D., a purchaser of Tri-Emerald securities, by causing materially false and fraudulent statements and material omissions to be made to Victim Investor A.D. about the immediacy and probability of Tri-Emerald's initial public offering ("IPO") occurring and the resulting share price, the alleged involvement and representations made by Investment Bank 1 as the underwriter of Tri-Emerald's IPO, and the use of the funds raised from the sale of Tri-Emerald securities to Victim Investor A.D.

6.    The scheme to defraud operated, in substance, as follows:

a.    Defendant POUJADE would offer Victim Investor A.D. investment contracts to purchase Class A Common Shares in Tri-Emerald at $10 per share that defendant POUJADE represented were "securities" under the Securities and Exchange Act of 1934.

1          b.   To persuade Victim Investor A.D. to purchase Tri-

2  Emerald common shares, defendant POUJADE made, and caused others

3  to make, numerous false and misleading statements about Tri-

4  Emerald to Victim Investor A.D, both during direct exchanges

5  with Victim Investor A.D. in-person or over the telephone, and

6  through electronic messages transmitted to Victim A.D. via

7  WhatsApp or email.

8          c.   Defendant POUJADE would instruct Victim Investor

9  A.D. to either write checks or wire payments for the purchase of

10  Tri-Emerald common shares that were deposited into Tri-Emerald's

11  bank accounts, which defendant POUJADE controlled.

12          d.   To convince Victim Investor A.D. to purchase Tri-

13  Emerald common shares, defendant POUJADE falsely represented

14  that Tri-Emerald was a pre-IPO investment opportunity that would

15  provide high returns when Tri-Emerald went public in the very

16  near future.  On numerous occasions during the course of the

17  scheme defendant POUJADE lulled, and caused others to lull,

18  Victim Investor A.D. into maintaining and increasing Victim

19  Investor A.D.'s investments in Tri-Emerald by falsely

20  representing to Victim Investor A.D. that Tri-Emerald was mere

21  weeks or months away from completing its IPO and becoming

22  publicly listed on the National Association of Securities

23  Dealers Automated Quotations Stock Market ("NASDAQ").  In truth,

24  as defendant POUJADE knew, Tri-Emerald was not weeks or months

25  away from completing its IPO because Tri-Emerald had not

26  completed the steps necessary to undertake an IPO, including

27  filing a Form S-1 with the SEC or formally engaging the

28  investment banks defendant POUJADE claimed to have formally

1  engaged to Victim Investor A.D. to serve as the underwriters.

2  Because Tri-Emerald had not filed a Form S-1 with the SEC nor

3  formally engaged the investment banks defendant POUJADE claimed

4  to have formally engaged to Victim Investor A.D. to serve as the

5  underwriters, it could not have completed the IPO process.

6           e.  To further induce Victim Investor A.D. to invest

7  in Tri-Emerald, defendant POUJDE would repeatedly make

8  materially false and misleading statements regarding Investment

9  Bank 1 and other investment banks serving as the underwriters of

10 Tri-Emerald's alleged IPO.  Defendant POUJADE would misrepresent

11 to Victim Investor A.D. the nature of Tri-Emerald's relationship

12 with Investment Bank 1 and other investment banks, telling

13 Victim Investor A.D. that Investment Bank 1 and other investment

14 banks would serve as the underwriters of Tri-Emerald's alleged

15 IPO.  Defendant POUJADE would also misrepresent to Victim

16 Investor A.D. that Investment Bank 1 stated that it valued Tri-

17 Emerald as a multi-billion-dollar company.  In fact, defendant

18 POUJADE never formally engaged Investment Bank 1 nor the other

19 investment banks defendant POUJADE claimed to have formally

20 engaged to Victim Investor A.D.; Investment Bank 1 nor any of

21 the other investment banks defendant POUJADE claimed to have

22 formally engaged to Victim Investor A.D. ever conducted due

23 diligence on Tri-Emerald in preparation for an IPO; and

24 Investment Bank 1 nor any of the other investment banks

25 defendant POUJADE claimed to have formally engaged to Victim

26 Investor A.D. ever performed a valuation of Tri-Emerald or made

27 statements regarding the value of Tri-Emerald.

28

1         f.    Defendant POUJADE would also falsely represent to

2  Victim Investor A.D. that the price of Tri-Emerald common shares

3  would be over $100 per share once Tri-Emerald completed the IPO

4  process and became publicly traded.  In fact, Tri-Emerald had

5  not taken the steps necessary to go public and an investment

6  bank had never performed a pre-IPO valuation of Tri-Emerald

7  shares.

8         g.    Defendant POUJADE would also falsely represent to

9  Victim Investor A.D. that Tri-Emerald would use, and had used,

10  the funds it raised by selling Tri-Emerald common shares to

11  Victim Investor A.D. to complete the IPO.  In doing so,

12  defendant POUJADE concealed from Victim Investor A.D. material

13  information about the anticipated and actual use of the proceeds

14  from the sale of Tri-Emerald common shares.  In truth, Tri-

15  Emerald did not use the proceeds of the securities it sold to

16  complete the IPO.  Instead, defendant POUJADE used a substantial

17  portion of the funds for general Tri-Emerald operating expenses

18  and to make lulling payments and litigation settlement payments

19  to previous Tri-Emerald investors.  Additionally, defendant

20  POUJADE used a portion of the funds for personal expenditures in

21  lieu of taking a salary.

22         h.    As a result of the scheme to defraud described

23  above, defendant POUJADE, operating through Tri-Emerald,

24  fraudulently obtained approximately $5,255,600 from Victim

25  Investor A.D.

26  C.    EXECUTION OF THE FRAUDULENT SCHEME

27      7.    On or about March 18, 2016, within the Central

28  District of California, and elsewhere, for the purposes of

1   executing the above-described scheme to defraud, and in

2   furtherance of the manipulative and deceptive devices described

3   above, defendant POUJADE directly, indirectly, and willfully

4   caused the use of a means and instrumentality of interstate

5   commerce in connection with the purchase and sale of securities,

6   namely, the transfer of approximately $160,000 from a bank

7   account controlled by Victim Investor A.D., processed through

8   the servers of the Federal Reserve Bank of New York in the

9   States of New Jersey and Texas, by means of interstate wires, to

10  a Citizens Business Bank account in Torrance, California

11  controlled by Tri-Emerald for the purchase of 16,000 shares of

12  Tri-Emerald Class A Common Shares.

13

14                          E. MARTIN ESTRADA
                            United States Attorney

15

16

17                          MACK E. JENKINS
                            Assistant United States Attorney
                            Chief, Criminal Division

18

19                          BENJAMIN R. BARRON
                            Assistant United States Attorney
                            Chief, Santa Ana Branch Office

20

21                          BRADLEY E. MARRETT
                            Assistant United States Attorney
                            Deputy Chief, Santa Ana Branch

22                          Office

23                          RYAN G. ADAMS
                            Special Assistant United States

24                          Attorney
                            Santa Ana Branch Office

25

26

27

28

                                  7